NO. 4-97-0575

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FIRST OF AMERICA BANK-ILLINOIS, N.A., ) Appeal from

formerly known as FIRST OF AMERICA ) Circuit Court of

BANK-SPRINGFIELD, N.A., ) Sangamon County

Plaintiff-Appellant, ) No. 96L0087

v. )

NICHOLAS D. DRUM, Individually and ) 

d/b/a SPRINGFIELD COACHWERKS,   ) 

Defendant, )

and ) Honorable

STEPHEN G. VINCENT, ) Sue E. Myerscough,

Defendant-Appellee. ) Judge Presid­ing.

_________________________________________________________________

JUSTICE COOK delivered the opinion of the court:

The trial court denied both parties' motions for summary judg­ment but made the necessary find­ings for an inter­locutory appeal under Supreme Court Rule 308.  155 Ill. 2d R. 308.  We answer the ques­tion of law identified by the trial court and remand for further pro­ceed­ings.   

For several years plain­tiff First of America Bank-Illi­nois, N.A. (Bank), extended a line of credit to defen­dants Nicho­las D. Drum and Stephen G. Vin­cent.  The most recent docu­ments executed by the parties were a letter and promis­so­ry note dated April 1, 1994, and executed May 27, 1994.  The letter referred to a commit­ment, in the amount of $175,000, for a term of one year.  The note was in the amount of $175,000, due April 1, 1995, with interest payable on the first day of each month.  The note recited that it evi­denced a line of credit, that pay­ments on princi­pal could be made from time to time, that the Bank could 

subse­quently readvance said funds up to the full principal amount of the note, and that separate notes would not be executed for such advances but, rather, the advances and payments would be record­ed in a loan account.  The note provided that "ad­vanc­es hereun­der shall at all times be made at the sole discre­tion of the Bank, and Bank shall not have any obliga­tion whatso­ever to make any such advanc­es."  

Drum operated a used-car business.  He had a floor plan line of credit with the Bank since June 26, 1992.  On April 1, 1993, Vincent, whom the Bank describes as a "customer of Drum," agreed to cosign a renewal note increasing the line of credit from $30,000 to $100,000.  The various letters and notes describe Vincent as a "borrower," but some bank records refer to him as a "guaran­tor."  The line of credit was again in­creased, to $130,000, in August 1993.  The most recent letter and note, described above, were executed May 27, 1994.  

On April 1, 1995, the note matured, with a principal amount owing of $169,000.  The Bank did not call the note, but continued to allow Drum to access the line of credit until January 18, 1996, while the Bank at­tempted to negotiate a renewal of the note.  The cumula­tive amount of Drum's draws, postmaturi­ty, was approx­i­mately $260,000, but Drum was making pay­ments on principal during that time and, accordingly, the amount of credit extended at any one time was never greater than $175,000.  The present record, interestingly enough, indi­cates that there were no conversations between the Bank and Vincent during the April 1, 1995, to January 18, 1996, time period.  According to Vincent, the Bank's April 26, 1995, floor plan audit re­vealed there were nine missing cars, and Drum refused to provide financial state­ments after that time.  On January 18, 1996, after another floor plan audit, Drum admit­ted to the Bank that he had sold cars out of trust, and the Bank called the note, set off Drum's deposit accounts, and seized and liqui­dated the collat­eral.  After set- off and liquida­tion, the princi­pal amount was reduced to $98,801.71.  Drum subsequently filed for bankrupt­cy.  

As a preliminary matter we review the law of suretyship defenses under section 3-605 of the Uniform Commercial Code--Negotiable Instruments.  810 ILCS 5/3-605 (West 1996); see also 2 J. White & R. Sum­mers, Uniform Commercial Code §16-10, at 105-06 (4th ed. 1995) (dis­cussing suretyship defenses).  As between the surety and the debtor, it is clear that the debtor has the primary obliga­tion to pay the debt.  If the creditor releases the princi­pal debtor without insisting on full payment (section 3-605(b)) or extends the due date of the note (section 3-605(c)), or otherwise materi­ally modifies the obliga­tion (sec­tion 3-605(d)) or impairs the collat­eral (section 3-605(e)), the surety's burden may be in­creased.  The law has tradi­tionally held that conduct by the creditor that increases the surety's risk dis­charges the surety or reduces the surety's obligation 
pro
 
rata
.  

Some conduct by the credi­tor, however, may actually leave the surety better off.  White & Summers give the example of the creditor who grants an extension because the debtor, who honestly hopes to pay the debt, needs an extra week to gather the money.  See 2 J. White & R. Summers, Uniform Commer­cial Code §16-11, at 116 (4th ed. 1995).  It may be reasonable to chance future voluntary payment over immediate forced collec­tion.  For this reason the Uniform Commercial Code allows surety­ship defenses to be waived by language in the note.  That lan­guage may be either specific or gener­al.  810 ILCS 5/3-605(i) (West 1996).  Of course, any extension, indul­gence or release must be done in good faith.  See 2 J. White & R. Summers, Uniform Commercial Code §16-11, at 115-19 (4th ed. 1995).  The surety may also consent to the conduct of the creditor, which makes it important to know whether there were any conversations in this case between Vincent and the Bank or between Vincent and Drum.  810 ILCS 5/3-605(i) (West 1996).

Vincent argues that he is an accommodation maker or guaran­tor and accordingly is entitled to suretyship defenses.  

Vincent first argues that when the Bank extended the due date of the note it violated his rights under section 3-605(c) and he is accordingly discharged.  That argument must be rejected, as there is language in the note waiving that defense.  We quote that language later in this opinion.  Vincent also argues that the Bank's conduct in this case consti­tutes other material modifica­tion of the obligation under section 3-605(d).  Under that section, Vincent would be entitled to discharge to the extent the modification caused him loss and the burden of proof would be on the Bank to show that no loss was caused.  810 ILCS 5/3-605(d) (West 1996).   

Vincent finally argues that even if he were merely a comaker of the note, jointly and severally obligated for its payment, (1) he was only obliged to pay the instrument "according to its terms at the time it was issued" (810 ILCS 5/3-412 (West 1996)), (2) the Bank's actions in continuing to advance funds after the note had matured materi­ally altered his obligations, and (3) he is accordingly dis­charged.  Certainly this line-of- credit note anticipated there would be advanc­es after it was "issued" (April 1, 1994), but it is not clear there could be advances after the note matured (April 1, 1995).  Even a party who is not an accommodation maker, one who is jointly and sever­al­ly liable as a comaker, is dis­charged when a person enti­tled to enforce the instrument impairs the value of the interest in collateral, to the extent the impairment causes the comaker to pay more than the comaker would have been obliged to pay, taking into account rights of contribution from other comakers.  The burden of proving such impairment is on the party asserting dis­charge.  810 ILCS 5/3-605(f) (West 1996).  

The Bank did more in this case than extend the due date of the note.  The Bank advanced new money after the note matured, for which the Bank claims that Vincent is liable.  Both section 3-605(c) and section 3-605(d) provide for discharge only to the extent the extension or modification caused loss, and it is not clear that any loss has been caused to Vincent.  The addi­tional advanc­es resulted in the acquisition of additional collat­eral.    It may be Vincent's claim that payments must be applied first to advanc­es made before the note matured, even if those payments were derived from postmaturity advances.  It hardly seems fair, however, for Vincent to receive the benefits of postmaturity advances while disclaim­ing any of the bur­dens.  Likewise the Bank may not be entitled to place collection of its postmaturi­ty advances, for which Vincent may not be liable, ahead of advances for which Vincent is liable.  See 2 J. White & R. Summers, Uniform Commercial Code §16-11, at 122 (4th ed. 1995).   

The Bank, citing the language from the note quoted above, argues that under the terms of the note it was entitled, not just to refrain from calling the note, but also to make additional advances on the note after it had ma­tured.  The question of law identified by the trial court, pursuant to Rule 308, was:

"Whether Vincent by executing the Note,

which contains the following provision:

The Borrower hereby waives present-

ment, demand, protest, notice of dis-

honor and agrees that each Borrower, if 

more than one, shall not be released or 

discharged by reason of any extension, 

indul­gence, or a release given to any 

person, or by the Bank's release, sale or 

nonaction with respect to the Collateral 

or any guarantee or other undertaking 

securing this Note.

authorized the Bank to extend additional 

credit to Drum after the maturity date of the

Note."

We answer that question in the negative.  The quoted language is common language found in almost all notes, both single-advance notes and line-of-credit notes.  The purpose of the quoted language is to limit or eliminate suretyship defenses, as autho­rized by section 3-605(i).  810 ILCS 5/3-605(i) (West 1996).  As discussed above, the particular suretyship defense addressed by the word "extension" is the defense created by "an extension of the 
due
 
date
."  (Emphasis added.)  810 ILCS 5/3-605(c) (West 1996).  Section 3-605 seems to have been written in terms of single advance notes, not the line-of-credit note involved here.  The Bank argues that if the due date is extend­ed, all the provi­sions of the note must be extended, and the provi­sions of this note allowed the Bank to make additional advances while the note was in existence.  The Bank's argument would negate clear lan­guage in this letter and note that the line of credit had a term of only one year.  See also 810 ILCS 5/5-106(c) (West 1996) (a letter of credit expires one year after its stated date of issuance).  If the Bank's argu­ment is correct, it was never neces­sary for it to renew a line-of-credit note, although it was clear the Bank regularly did so, had done so before in this case, and was attempting to do so with this note before the Bank decided to call it.  The Bank agrees that it was not bound to advance new money after the note matured here.  It is incon­gruous for the Bank to argue that Vincent on the other hand had to accept the making of advanc­es in perpetuity.  If that was the Bank's inten­tion, it should have includ­ed specific language in the note to accomplish that pur­pose.  

The Bank cites 
Shaughnessy v. Mark Twain State Bank
, 715 S.W.2d 944 (Mo. App. 1986).  
Shaughnessy
, however, did not involve a comaker or guarantor, and the only issue there was whether the lender was required to make advances under an irrevo­cable line of credit after the original note had been extended.  The decision states that the original note was "unilaterally" extended by the lender, but the decision quotes from a document by which "the parties hereby agree to extend and modify the Note so that it comes due On February 16, 1981."  (Emphasis omitted.)  
Shaughnessy
, 715 S.W.2d at 950.  The dispute in 
Shaughnessy
 was not over whether the extended note contained all the provisions of the original note, but whether the original note was a demand note.  The Bank also cites 
American National Bank v. Warner
, 127 Ill. App. 3d 203, 468 N.E.2d 184 (1984).  In 
American Nation­al
, 
however, there was no line of credit and there was no advance of new money after the original note ma­tured, only renewal notes signed by one of the comakers.  
Ameri­can National
 supports the proposition that language similar to ours is intend­ed to waive suretyship defens­es as allowed by section 3-605(i), specif­ically the defense of "exten­sion of the due date" described in section 3-605(c).  810 ILCS 5/3-605(i), (c) (West 1996).  

Trial courts are not allowed to send questions to the appellate court whenever they feel the need to do so.  Rule 308 applies only when the trial court makes an interlocutory order not otherwise appealable.  When the trial court identifies a question of law under Rule 308, the appeal is from the interlocu­tory order.  When the appellate court, in its discretion, allows an appeal under Rule 308, the court is not limited to answering the questions that the trial court has identified.  Instead the appellate court may "'enter any judgment and make any order that ought to have been given or made, and make any other and further orders and grant any relief *** that the case may re­quire.'"  
Schrock v. Shoemaker
,
 159 Ill. 2d 533, 537, 640 N.E.2d 937, 939 (1994), quoting Rule 366(a)(5) (134 Ill. 2d R. 366(a)(5)); see also 
Kerker v. Elbert
, 261 Ill. App. 3d 924, 925, 634 N.E.2d 482, 483 (1994); 
Schoonover v. American Family Insur­ance Co.
, 214 Ill. App. 3d 33, 40-41, 572 N.E.2d 1258, 1262-63 (1991); 
Billerbeck v. Caterpillar Tractor Co.
, 292 Ill. App. 3d 350, 356-57, 685 N.E.2d 1018, 1022-23 (1997) (discussing 
Schrock
 and scope of Rule 308 review).  Never­the­less, we must be cau­tious, in taking actions not taken by the trial court, that we do not deprive the parties of the opportuni­ty to show the error of those actions.  
Geaslen v. Berkson, Gorov & Levin, Ltd.
, 155 Ill. 2d 223, 230, 613 N.E.2d 702, 705 (1993).  
In this case summary judg­ment is not appro­pri­ate, at least not at the present time, because questions of fact exist, including whether the postmatu­ri­ty advances preju­diced the rights of Vincent.  

We do not suggest that the Bank acted improperly in making the postmaturity advances.  We hold only that the Bank is not entitled to look to Vincent for the repayment of those advances.  We answer the certi­fied ques­tion in the nega­tive and remand the case.  

Question answered; cause remanded.

GREEN and McCULLOUGH, JJ., concur.