199 P.3d 376 (2008)
MUTUAL OF ENUMCLAW INSURANCE COMPANY, Respondent,
v.
T & G CONSTRUCTION, INC., and Villas at Harbour Pointe Owners Association, Petitioners.
No. 80420-6.
Supreme Court of Washington, En Banc.
Argued May 27, 2008.
Decided October 23, 2008.
*378 Dina J. Wong, Daniel Eli Zimberoff, Barker Martin PS, Seattle, WA, for Petitioners.
James Morton Beecher, Brent William Beecher, Law Offices of Hackett, Beecher, & Hart, Seattle, WA, for Respondent.
CHAMBERS, J.
¶ 1 We are asked to balance the interests of an insured defendant in reaching a reasonable settlement with a claimant against the insurer's interest in fully litigating its insured's legal obligation to that claimant. In the case before us, Mutual of Enumclaw Insurance Company (MOE), the insurer, vigorously defended its insured, a construction corporation, almost to the end. However, MOE declined to participate in the final round of settlement talks. After the talks concluded, MOE challenged the settlement at the reasonableness hearing. Now, in this separate coverage action, MOE challenges its obligation to pay. MOE's principal argument is that under the insurance policy, it is obligated to pay only damages that its insured is legally obligated to pay. It believes its insured should have prevailed on an affirmative defense in the liability case. The judge in the underlying liability case rejected the proffered affirmative defense several times, including at summary judgment and at the reasonableness hearing. In this coverage dispute, the insurer seeks to raise the issue again.
¶ 2 While MOE is correct that its insured's affirmative defense was never litigated to absolute finality, it was substantially resolved in the underlying liability case. We hold that if a coverage question turns upon the same facts or law at issue in the underlying dispute between the claimant and the insured, the insurer will be bound by the results of a trial or settlement judicially approved as reasonable, absent a showing of collusion or fraud. We reverse the Court of Appeals to the extent it holds otherwise. However, we are *379 unable to determine on the briefing or record whether two policy exclusions apply. Accordingly, we remand to the trial court to reconsider consistent with this opinion the applicability of those two exclusions and to decide attorney fees.

FACTS
¶ 3 Villas at Harbour Pointe Owners Association (homeowners) sued the developer of their homes for poorly installed siding leading to rot and mold. The developer brought the general contractor into the lawsuit. In due course, the general contractor brought in the subcontractors, including the siding subcontractor, T & G Construction, Inc. (T & G). T & G in turn sued its own subcontractors. All in all, there were several dozen parties to the underlying suit.
¶ 4 T & G's insurer, MOE, defended T & G under a reservation of rights. More than a year into the underlying litigation, counsel discovered that T & G, a corporation, had been administratively dissolved by the secretary of state for failure to file corporate documents about two years and eight months before it had been sued. At the time, the general statute of limitations for claims against a dissolved corporation was two years. Former RCW 23B.14.340 (1995). Since this lawsuit was filed more than two years after T & G had been administratively dissolved, its counsel moved for summary judgment dismissal. Among other things, the homeowners argued that the general two year statute of limitations did not apply to known claimants who were not given notice of the dissolution and submitted evidence that the general contractor had informed T & G of the defects prior to its dissolution. Former RCW 23B.14.060 (1989). The trial court agreed with the homeowners and denied summary judgment.[1]
¶ 5 Over several mediations in 2004, almost all parties settled their underlying claims for a net $5.7 million. While T & G settled with and released its subcontractors at about that time, it did not participate in the larger final settlement talks, perhaps because MOE balked at the numbers. MOE appeared to believe that the potentially covered faulty work was limited to specific, remediable mistakes in installing siding around windows, which could be corrected with "spot" or "surgical" repairs costing about $300,000. The homeowners believed that because of T & G's faulty work and the damage that it caused, all buildings needed to be stripped and resided.
¶ 6 Pursuant to court order and presided over by a professional mediator, T & G entered into negotiations with the remaining parties. With MOE's knowledge, but without its consent or participation, the remaining parties settled their claims against T & G for an additional $3.3 million and the customary assignment of claims against the insurer. The parties sought a reasonableness determination from the Snohomish County Superior Court. MOE appeared in the subsequent reasonableness hearing and objected to the settlement. One of the many issues considered at the hearing was whether an ultimate trier of fact was likely to find that the statute of limitations applied to bar claims against T & G. The judge concluded that the trier of fact was likely to find that the statute of limitations did not apply.[2] The Snohomish County judge also concluded that T & G's proposed limited repair was not a sufficient remedy and that all siding needed to be removed and the buildings re-sided. The experts estimated that the cost of reclading *380 the buildings ranged between about $2 million and $4.6 million; the median of these estimates was the amount of the settlement: $3.3 million. In determining that the settlement was reasonable, the judge also took into consideration that the homeowners had spent $850,000 on the litigation and that, should the case go to trial, T & G was at risk for some or all of these expenses as well as its own costs in conducting a three to five week trial. Although the court initially found that the settlement of $3.3 million was reasonable, upon a motion for reconsideration by MOE, the judge reduced it to $3 million.
¶ 7 Meanwhile, MOE brought this declaratory judgment action in King County Superior Court against the surviving parties, including its insured,arguing that its insured was not liable on the grounds that the statute of limitations had run, that the insured's damages were outside the coverage provisions, that T & G had breached its obligation to cooperate, and that several policy exceptions applied. In a sequence of decisions, Judge Spector granted summary judgment against MOE on all issues.
¶ 8 The Court of Appeals reversed. It concluded that given the lack of bad faith, MOE should be allowed to litigate to finality whether the statute of limitations had run on the underlying claims and, if the trial court concluded that the statute of limitations had not run, directed it to consider whether MOE had been prejudiced by its insured's failure to cooperate at the end of the liability case. Mut. of Enumclaw Ins. Co. v. T & G Constr., Inc., 143 Wash.App. 667, 2007 WL 959894 (2007). Simultaneously, the Court of Appeals upheld the settlement in the liability suit. Villas at Harbour Pointe Owners Ass'n v. Mut. of Enumclaw Ins. Co., 137 Wash.App. 751, 154 P.3d 950 (2007), review denied, 163 Wash.2d 1020, 180 P.3d 1292 (2008).
¶ 9 The homeowners and T & G sought review of the coverage case while MOE separately sought review of the underlying liability case. We accepted review of this coverage dispute. We reverse in part, affirm in part, and remand to the trial court for further proceedings consistent with this opinion.

ANALYSIS
¶ 10 Since only questions of law are presented, our review is de novo. Sherry v. Fin. Indem. Co., 160 Wash.2d 611, 617, 160 P.3d 31 (2007) (citing Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 149 Wash.2d 660, 670, 72 P.3d 151 (2003)). Under the insurance contract, MOE is obligated to only "pay those sums that the insured becomes legally obligated to pay as damages because of ... `property damage.'" Clerk's Papers (CP) at 646. The primary issue we must resolve is whether the insurer is entitled to an independent determination in a coverage declaratory judgment action of the facts establishing its insured's liability when those disputed facts were considered in the liability case and the parties reached a settlement which was judicially approved as reasonable. MOE contends that the liability suit did not resolve whether its insured was in fact legally obligated to pay damages because there was no final decision on whether the statute of limitations had run before the case was filed. T & G and its assignee, the homeowners, counter that by virtue of the settlement and its approval by the trial court in a reasonableness hearing, whether it is "legally obligated to pay damages" has been finally adjudicated and should not be relitigated.
¶ 11 Generally speaking, "an insurer will be bound by the `findings, conclusions and judgment' entered in the action against the tortfeasor when it has notice and an opportunity to intervene in the underlying action.'" Fisher v. Allstate Ins. Co., 136 Wash.2d 240, 246, 961 P.2d 350 (1998) (citing Finney v. Farmers Ins. Co., 21 Wash.App. 601, 618, 586 P.2d 519 (1978)). This avoids inconsistent judgments, delay, additional expense, and the creation of a perverse incentive for carriers to wait until liability and damages had been established before deciding whether it is cost-effective to intervene. Id. at 249, 961 P.2d 350. Even a default judgment against an uninsured tortfeasor is enforceable against an underinsured motorist insurer who had notice of the suit, even though the parties have not fully litigated the underlying dispute. Lenzi v. Redland Ins. Co., 140 Wash.2d 267, 280, 996 P.2d 603 *381 (2000) (quoting Loveridge v. Fred Meyer, Inc., 125 Wash.2d 759, 763, 887 P.2d 898 (1995)). The insurer is bound "`to what might, or should, have been litigated as well as to what was actually litigated.'" Id. at 280, 996 P.2d 603 (quoting Philip A. Trautman, Claim and Issue Preclusion in Civil Litigation in Washington, 60 WASH. L.REV. 805, 813-14 (1985)).
¶ 12 What the insured is legally obligated to pay is the exact issue to be determined in the liability suit. After discovery reveals the strengths and weakness of the parties' respective positions, the vast majority of liability actions are settled without trial. The parties may ask the trial court to determine whether the settlement is reasonable. In Glover, this court articulated factors that should be considered by courts in determining the reasonableness of a settlement for the purposes of contribution among joint tortfeasors under former RCW 4.22.060 (1981). Glover v. Tacoma Gen. Hosp., 98 Wash.2d 708, 711, 716-17, 658 P.2d 1230 (1983), overruled on other grounds by Crown Controls, Inc. v. Smiley, 110 Wash.2d 695, 756 P.2d 717 (1988). In Chaussee, the Court of Appeals adopted the same factors to determine the reasonableness of an assignment of coverage and bad faith claims by an insured in exchange for a covenant not to execute from a plaintiff. Chaussee v. Md. Cas. Co., 60 Wash.App. 504, 512, 803 P.2d 1339 (1991). In Besel, we approved the procedure. Besel v. Viking Ins. Co. of Wis., 146 Wash.2d 730, 738, 49 P.3d 887 (2002). Under Glover and Besel, the factors a court must consider to determine if a settlement is reasonable are (1) the releasing party's damages; (2) the merits of the releasing party's liability theory; (3) the merits of the released party's defense theory; (4) the released party's relative fault; (5) the risks and expenses of continued litigation; (6) the released party's ability to pay; (7) any evidence of bad faith, collusion, or fraud; (8) the extent of the releasing party's investigation and preparation; and (9) the interests of the parties not being released. Glover, 98 Wash.2d at 717-18, 658 P.2d 1230; see also Besel, 146 Wash.2d at 738, 49 P.3d 887.
¶ 13 The merits of the homeowners' liability case and the merits of T & G's defense theories were, of course, central to any settlement because whether to settle, and under what terms, turned in large part on the risk of an adverse judgment. Those same issues must be carefully considered in any judicial proceeding to determine the reasonableness of the settlement. Like any issue touching on the liability of a releasing party, T & G's statute of limitation defense had to have been considered by the parties during settlement discussions and was carefully evaluated by the judge both at summary judgment and at the reasonableness hearing.
¶ 14 MOE stresses "that it is not, nor has it ever, argued that an insurer should have the right to re-present, in the coverage action, normal liability defenses that belonged to its insured in the underlying action." Suppl. Br. of Resp. at 15. MOE contends that this particular defense is different because, it contends, it goes to the court's jurisdiction and thus, under the peculiar facts of this situation, it should be allowed to challenge T & G's legal obligation to pay damages in the coverage case.
¶ 15 We disagree. First, the court's power to adjudicate claims relating to a defunct corporation is well established in statutory law. See ch. 23B.14 RCW. Second, MOE's insured was already allowed to argue the statute of limitations defense theory in the liability suit. In the liability suit, MOE's interest and its insured's interest in advancing the statute of limitation defense were one and the same. When the insured lost on its motion for summary judgment on the statute of limitation defense, both T & G and MOE were put at risk of an adverse judgment. T & G had no reason not to vigorously asset its theory. Third, there is nothing special about the statute of limitations defense when, as here, it largely turns on disputed facts. It is just an affirmative defense like any other affirmative defense. Allowing the insurer to relitigate it in the coverage suit once liability has been evaluated and a settlement judicially approved runs afoul the very policy concerns articulated in Fisher and underlying Lenzi. See Fisher, 136 Wash.2d at 248-49, *382 961 P.2d 350; see also Lenzi, 140 Wash.2d 267, 996 P.2d 603.
¶ 16 MOE argues that we should carve out an exception for the statute of limitations. It relies strongly on Ballard Square Condominium Owners Ass'n v. Dynasty Construction Co., 158 Wash.2d 603, 146 P.3d 914 (2006). However, Ballard Square was decided after liability had been settled by the parties and approved by the trial court. Further, it did not concern the statute of limitations for predissolution claims brought by known claimants who had no notice of dissolution, Ballard Square, 158 Wash.2d at 614 n. 6, 146 P.3d 914, a major issue in this case.
¶ 17 MOE also argues that the judgment entered in the liability suit is void on the theory that the trial court lacked personal and subject matter jurisdiction. It argues that there is no personal jurisdiction because a corporation exists only by legislative grace, and, it contends, that grace had been withdrawn with the administrative dissolution. From that, it reasons there is no subject matter jurisdiction because there has to be an opponent for there to be a case. Not only is this argument circular, but the court has personal jurisdiction over T & G to determine whether the statute of limitations had run by virtue of chapter 23B.14 RCW and clearly has subject matter jurisdiction over torts as a whole. See (if nothing else) Title 4 RCW; see also CONST. art. IV, § 6; Dougherty v. Dep't of Labor & Indus., 150 Wash.2d 310, 315-16, 76 P.3d 1183 (2003) (subject matter jurisdiction is jurisdiction over the type of case); Marley v. Dep't of Labor & Indus., 125 Wash.2d 533, 538-39, 886 P.2d 189 (1994) (noting that a court has subject matter jurisdiction when the parties have submitted to the jurisdiction of the court and the court has jurisdiction over the type of controversy) (citing RESTATEMENT (SECOND) OF JUDGMENTS §§ 1, 11 (1982)). A statute of limitation is merely a time limit on when an action may be commenced; properly understood, it neither confers nor removes subject matter jurisdiction. Both the liability court in Snohomish County and the coverage court in King County had jurisdiction. Both considered and rejected MOE's statute of limitations argument in its proper context: as an affirmative defense for T & G. Neither MOE's lack of jurisdiction argument nor its motion to dismiss on that ground is well taken.[3]
¶ 18 A good faith settlement establishes the insured's presumptive damages when the insurer, in bad faith, declines to participate in the liability suit. Besel, 146 Wash.2d at 738, 49 P.3d 887. Washington courts have not had clear occasion to determine whether a reasonable and good faith settlement establishes the fact of liability and the presumptive amount of damages in the absence of an insurer's bad faith. Several other states have found that it does. See, e.g., United Servs. Auto. Ass'n v. Morris, 154 Ariz. 113, 120-21, 741 P.2d 246 (1987) (explicitly rejecting claim that an insurer could raise a liability defense in a coverage case); Patrons Oxford Ins. Co. v. Harris, 2006 ME 72, ¶¶ 19, 22, 905 A.2d 819; Miller v. Shugart, 316 N.W.2d 729, 731 (Minn.1982). We agree. Such a holding is a reasonable extension from Fisher and its progeny. When the insurer had an opportunity to be involved in a settlement fixing its insured's liability, and that settlement is judged reasonable by a judge, then it is appropriate to use the fact of the settlement to establish liability and the amount of the settlement as the presumptive damage award for purposes of coverage. It is also consistent with this court's observation in Besel that "[i]f a reasonable and good faith settlement amount of a covenant judgment does not measure an insured's harm, our requirement that such settlements be reasonable is meaningless." Besel, 146 Wash.2d at 739, 49 P.3d 887.[4] We do not *383 condone fraud or collusion, but we have been given no reason to believe either happened here. The settlement before us was negotiated during arm's length settlement negotiations.
¶ 19 We hasten to add that the presumptive damages are not necessarily the covered damages. Settlements are generally global, covering all of the plaintiff's harm caused by the insured. An insurance policy might provide coverage for only someor even none of that harm. For example, a comprehensive general liability policy (despite its name) might exclude work performed by the insured and its subcontractors but provide coverage for the insured's failure to properly inspect work it consulted upon. E.g., Truck Ins. Exch. v. VanPort Homes, Inc., 147 Wash.2d 751, 755, 763, 58 P.3d 276 (2002). An insurer may properly litigate these questions in a coverage case. Diamaco, Inc. v. Aetna Cas. & Sur. Co., 97 Wash.App. 335, 337, 983 P.2d 707 (1999).
¶ 20 However, it would be inequitable to allow an insurer to relitigate questions that were resolved in the underlying liability action. Accordingly, we hold that an insurer is not entitled to litigate factual questions that were resolved in the liability case by judgment or arm's length settlement.

OTHER COVERAGE ISSUES
¶ 21 The insured bears the burden of showing that coverage exists; the insurer that an exclusion applies. Am. Star. Ins. Co. v. Grice, 121 Wash.2d 869, 875, 854 P.2d 622 (1993). MOE argues that some of the settlement in the underlying suit was for contract violations, not for covered property damage. It also argues that policy exclusions for "impaired property," for "withdrawal from use" or for "your work" apply. The trial court rejected all of these arguments. The Court of Appeals did not reach any of them, beyond noting that the "trial court appears to have erroneously relied on the reasonableness determination to decide whether policy exclusions applied." Mut. of Enumclaw, 143 Wash.App. at 678, 2007 WL 959894. We do not concur with the Court of Appeals' characterization of the basis of the trial court's judgment. The trial court was presented with, and relied upon, far more evidence than merely the findings of fact and conclusions of law in the liability suit when determining that coverage existed and the exclusions do not apply. We turn now to MOE's other specific arguments.

A. FAILURE TO OBTAIN CONSENT
¶ 22 MOE argues T & G violated the policy condition requiring it to obtain the consent of the insurer before it settled with a plaintiff. But "an insured's noncompliance with a cooperation clause releases the insurer from its responsibilities `only if the insurer was actually prejudiced by the insured's actions or conduct.'" Pub. Util. No. 1 of Klickitat County v. Int'l Ins. Co., 124 Wash.2d 789, 803, 881 P.2d 1020 (1994) (quoting Or. Auto. Ins. Co. v. Salzberg, 85 Wash.2d 372, 377, 535 P.2d 816 (1975)). We find MOE's contention to be completely without merit. MOE owes a fiduciary-type duty to its insured. Safeco Ins. Co. v. Butler, 118 Wash.2d 383, 389, 823 P.2d 499 (1992). MOE refused to participate in settlement negotiations that would have relieved T & G and its principals of significant financial risk. MOE cannot put its financial interest before the interest of its insured; for an insurer to do so is to act in bad faith. Cf. id.; see also Tank v. State Farm Fire & Cas. Co., 105 Wash.2d 381, 385-86, 715 P.2d 1133 (1986) (collecting cases). MOE was on notice of the settlement and had an opportunity to intervene in the reasonableness proceedings. MOE did intervene, was heard, and as a result, the judge presiding over the reasonableness proceedings reduced the reasonable value of the settlement by $300,000. MOE has not shown possible prejudice.[5]

*384 B. PROPERTY DAMAGE
¶ 23 The insurance policy at issue covered property damage, not breach of contract damages. MOE argues that much of the damage award was based upon a breach of contract. The trial court rejected this argument at summary judgment, finding as a matter of law that the damages were property damages. MOE concedes that some interior walls were damaged by water intrusion. However, MOE argues that the siding was largely undamaged. It reasons that the cost of removing and reinstalling the siding is not property damage. But "property damage," like "comprehensive general liability coverage," is a term of art and does not necessarily mean tangible damage to tangible property. It can include consequential damages, such as those alleged here. See Yakima Cement Prods. Co. v. Great Am. Ins. Co., 93 Wash.2d 210, 219, 608 P.2d 254 (1980) (citing Labberton v. Gen. Cas. Co., 53 Wash.2d 180, 332 P.2d 250 (1958) and Gen. Ins. Co. of Am. v. Gauger, 13 Wash.App. 928, 538 P.2d 563 (1975)). MOE focuses on the siding and argues that it was not damaged property under the insurance contract so it should not have to pay to have it remediated. But the subsurface and interior walls were not installed by T & G and damage to these areas was property damage covered by the policy. Removing and repairing the siding is simply part of the cost of repairing the damage to the interior walls and was properly treated as property damage by the trial court.
¶ 24 Recently, the Ninth Circuit considered a similar claim to the one MOE makes here. See Dewitt Constr., Inc. v. Charter Oak Fire Ins. Co., 307 F.3d 1127 (9th Cir.2002). The policy there, like here, provided that the insurer will "`pay as damages because of ... `property damage' to which this insurance applies.' `Property damage' means: (a) `physical injury to tangible property, including all resulting loss of use of that property' or (b) `loss of use of tangible property that is not physically injured,'" but not breach of contract damages. Id. at 1133 (alteration in original) (quoting policy). The court found that the alleged damage to other subcontractors' work caused by the defective work of the defendant was property damage, not breach of contract damages. Id. We agree and conclude that removal and reinstallation of the siding was within the scope of property damage.

C. "IMPAIRED PROPERTY" EXCLUSION
¶ 25 The policy also excludes:
"Property damage" to "impaired property" or property that has not been physically injured, arising out of:
(1) a defect, deficiency, inadequacy or dangerous condition in "your product" or "your work;" or
(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.
CP at 648. "Impaired property" is defined as "tangible property other than `your product' or `your work' that cannot be used or is less useful ... if such property can be restored to use by ... repair, replacement, adjustment or removal of `your product' or `your work.'" CP at 655. Again, it is MOE's position that it is not responsible for the cost of removing and replacing the siding where there was no evidence that the subsurface material and interior walls had been damaged merely because of the potential that the siding was leaking causing a likelihood of *385 future damage. MOE reasons the policy does not cover future potential damage. Again, the impaired property is not the siding installed by T & G but the subsurface and interior walls beneath the siding. The King County coverage court relied heavily upon the findings of the Snohomish County liability court's findings of fact. Among other things, the Snohomish County judge found:
It is very likely plaintiff standing in [the general contractor's] shoes would have been able to prove the need for total removal of siding and building paper. Numerous invasive investigative opening done at the Villas condominiums during discovery showed that the building paper underneath all of the siding was misapplied in a manner causing water intrusion. The barrier had gaps, holes and tears. The building paper and flashing problems were proved to be pervasive. Rot, decay and elevated moisture levels were already showing on buildings only a few years old. Only full strip and reclad can assure there won't be further water intrusions from the problems. Full siding removal is the only way of discovering all the defects and the only remedy that would allow the homeowners to sell their property in the future for full value by advising future owners that the problem has been fully remedied.
CP at 615. The trial court concluded that virtually all of the subsurfaces were impaired because of the manner in which T & G "reverse lapped" and misapplied the weather protective material that trapped water and caused rot and decay. The trial court rejected MOE's "spot" or "surgical" repairs because the rot and decay was so pervasive.
¶ 26 However, MOE focuses on that part of the finding that refers to the future value of the property, which it argues is contract damages rather than covered damages. MOE is correct; the coverage issue is different from the global damages issue. But the policy does cover all damages reasonably necessary to mitigate the impaired property. Although the coverage court may rely upon the factual findings of the liability court, where the issues presented to the liability court differ from the issues before coverage court, the coverage court must determine that the damages are covered damages. It may be that the coverage court concluded that all of the subsurfaces were impaired by the manner in which the weather resistance paper was applied. But we agree with the Court of Appeals that from the record before us we cannot tell if the coverage trial court concluded substantially all of the subsurfaces were impaired or merely accepted the findings of the liability judge that the settlement was reasonable given (among other things) that the value of all the poorly sided property had been impaired even if there had been no actual property damage to a particular wall. Therefore we remand to the trial court for further proceedings on the applicability of this exclusion.

D. "YOUR WORK" EXCLUSION
¶ 27 MOE contends that the cost to strip and reclad the condominiums is excluded by the "your work" exclusion. That exclusion says:
"Property damage" to "your work" arising out of it or any part of it and included in the "products completed operations hazard."
This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.
CP at 648. MOE's "your work" exclusion mirrors its "impaired property" exclusion argument. In the "impaired property" exclusion argument, MOE argues that the siding was not impaired so it should not be required to pay for its replacement. In its "your work" exclusion argument it contends that the siding was T & G's work. T & G was the siding contractor. Therefore, it reasons that there is no coverage for the removal and replacement of the siding. But as we have previously said, if the siding must be removed to repair damage caused by T & G to the surfaces and interior walls underneath the siding, then there is coverage for the cost of the removal and replacement of the siding. But like the impaired property exclusion, we cannot tell from the record before us if all of the buildings and walls needed to be re-sided *386 because of impaired subsurfaces and accordingly remand to the trial court for further proceedings.

E. ATTORNEY FEES
¶ 28 T & G seeks RAP 18.1 and Olympic Steamship attorney fees. See Olympic S.S. Co. v. Centennial Ins. Co., 117 Wash.2d 37, 52-53, 811 P.2d 673 (1991). As we have recently reiterated, "`[a]n insured who is compelled to assume the burden of legal action to obtain the benefit of its insurance contract is entitled to attorney fees.'" Colo. Structures, Inc. v. Ins. Co. of the W., 161 Wash.2d 577, 597-98, 167 P.3d 1125 (2007) (alteration in original) (quoting Olympic S.S., 117 Wash.2d at 54, 811 P.2d 673). The trial court properly awarded Olympic Steamship attorney fees finding that T & G had to litigate to receive the benefits of coverage. Inasmuch as we are remanding two coverage issues to the coverage trial court, the award of Olympic Steamship attorney fees must abide by that court's ultimate rulings. Cf. Colo. Structures, 161 Wash.2d at 606-07, 167 P.3d 1125.

CONCLUSION
¶ 29 An insurer is entitled to a final determination on coverage questions. But if a coverage question turns on the very same facts that are in dispute in the underlying litigation between its insured and the claimants, the insurer will be bound by the factual findings of a good faith settlement, which is judicially approved as reasonable. Absent a showing of fraud or collusion, the settlement amount is the presumptive amount of damages of the insured even if the insurer acts in good faith. However, because insurance policies may provide coverage for some types of damage but not others and because settlements are generally global in the sense they resolve all claims of damages, an insurer may still be entitled to contest which damages are covered and which are not. As to MOE's "impaired property" and "your work" exclusion, we cannot tell from the record whether the trial court relied solely upon the Snohomish County liability court's global settlement or whether the court concluded that all of the damages were for impaired property and not for work done by T & G. We remand to the trial court to reconsider whether those two policy exceptions apply and to determine whether Olympic Steamship attorney fees are available.
WE CONCUR: Chief Justice GERRY L. ALEXANDER, SUSAN OWENS, CHARLES W. JOHNSON, MARY E. FAIRHURST, BARBARA A. MADSEN, JAMES M. JOHNSON, RICHARD B. SANDERS, JJ., and JOEL M. PENOYAR, J. Pro Tem.
NOTES
[1] The record before us reflects at least three fax communications to T & G in 2001 and 2002 that could have put it on notice about defective siding. One of the faxes refers to previous phone calls about the subject. There seems to be little dispute about notice of contentions of defective siding. However, MOE relies upon a declaration of a T & G foreman, and perhaps other witnesses, that whenever complaints were received, the problems were corrected and therefore, although there may have been contingent creditors, there were no known creditors. As far as we can discern from the record, this seems to be the nub of the factual dispute.
[2] In the liability case, Judge Farris also relevantly ruled that "[i]t is also likely Construction Associates' claim that it was a known creditor would have been found true by a jury in light of the sworn statements by [Construction Associates'] former employees, other evidence and complaints made." Clerk's Papers at 631. Construction Associates was the general contractor and a defendant in the underlying case.
[3] MOE filed this motion to dismiss shortly before oral argument. T & G filed motions to supplement the record and to strike a portion of its opponent's briefing (among other things). T & G's motions are denied as moot; MOE's motion is denied on its merits.
[4] The Court of Appeals is correct that coverage by estoppel is only applicable when the insurer acts in bad faith; however, coverage by estoppel is uniquely different from the coverage issues before us. Coverage by estoppel prevents an insurer who has acted in bad faith from denying coverage even if it turns out there was no coverage under the policy. Safeco Ins. Co. v. Butler, 118 Wash.2d 383, 394, 823 P.2d 499 (1992). Further, coverage by estoppel will require the insurer to pay all damages regardless of policy limits. Besel, 146 Wash.2d at 740, 49 P.3d 887. Thus coverage by estoppel is the remedy for, and to some extent, the deterrence against, some acts of bad faith. While T & G did argue MOE was estopped from relitigating issues adjudicated in the underlying case, it and its assigns do not argue coverage by estoppel.
[5] In a similar vein, MOE argued to the Court of Appeals (though not to this court) that it should not be liable for any portion of the settlement attributable to the homeowners' attorney fees. The trial court found that the settlement was squarely in the middle of damage estimates. As the trial court noted, the risk of an adverse decision on attorney fees at trial may factor into the reasonableness of a settlement. But a significant if not principal factor that led to the settlement was T & G's faulty installation of the siding, which caused rot and mold to the surfaces under the siding, an event covered by MOE's policy. Litigation costs are directly attributable to the covered event. Under these circumstances, allowing an insurer to translate that mere risk into a non-covered percentage of a settlement would violate the insurer's obligation to not put its own financial interests above its insured.